Good morning, your honors. Good morning, counsel. Angelo Paparelli appearing on behalf of Brazil Quality Stones and Eugenio dos Santos. This case, your honors, is momentous, and it's momentous for a variety of reasons. The Ninth Circuit's jurisprudence in removal cases is well established, well developed. But employment-based immigration lawyers have been waiting 18 years for a definitive interpretation of the Immigration Act of 1990. In particular, this is the first opportunity to consider the IMACT provision that deals with non-immigrant L-1 visas for intracompany managers, executives, and workers possessed of specialized knowledge. The L-1 category first came into being in 1970, and its purpose then, as it is today, was to facilitate the transfer of international employees who perform in a qualifying capacity from a foreign-affiliated entity to a U.S. entity under common control. The 1970 enactment, however, did not contain a provision limiting the transfer of managers in any way as it applies to startup businesses or contain a definition of doing businesses. And the legislative history is clear that it did not intend that the type of entity only be large or monolithic and could include small businesses. The Administrative Appeals Office of USCIS denied the extension of the L-1 petition of Brazil Quality Stone, and they ruled essentially that there was insufficient evidence to show that BQS had been doing business for the entire year since approval of the initial L-1 visa application. Now, this is an administrative agency determination which will review for substantial evidence in the record? No, Your Honor. It's review for abuse of discretion, arbitrary or capricious, or otherwise not in accordance with law. And I would suggest that in line with the recent case in December from this Court, Estrada-Rodriguez v. Skidmore, basically that a decision such as this, which was not designated a precedent or published, is one that will be upheld only if it has the power to persuade. And the Estrada-Rodriguez case cites Skidmore and U.S. v. Meade for that proposition. So I would maintain that the decision, since it is not designated as a precedent and it has not been published, should not be given any greater deference, but should be read to interpret whether it was persuasive, the grounds cited are persuasive. Going back to what the AAO had decided, they did not dispute that BQS was doing business for the two months prior to the submission of the extension petition for his L-1 visa. The agency, however, made a distinction between commencing to do business, a term that is not in the regulations or the statute, and doing business. I might mention that the term doing business is not in the statute either. It the agency inferred, despite the absence of any evidence, that Mr. Dos Santos simply could not be a manager of an essential function since he must be performing the function rather than managing the function. Now, to understand the law. But doesn't the regulation require that he be primarily a manager? That is to say, he doesn't qualify if 10 percent of his time is spent managing and the other 90 percent is loading stuff on a dock. Well, Your Honor, we have to look at what the word primarily has been interpreted to mean. Sure. And to do that, we have to look at the law before 1980, 1990, and specifically the regulations that became final on February the 26th, 1987. In those regulations, they are premised on the concern that the agency is concerned  and I will note in passing that the government has acknowledged at trial that there is no evidence or allegation of any fraud or abuse by either the company or Mr. Dos Santos. In 1987, when these final rules came about, they introduced for the first time something that was never in the statute, a one-year limitation for startup companies. They defined the term doing business and they included a limitation on the definition of managerial capacity. Let's talk about the one-year limitation. If you look to the prefatory comment to the 1987 regulations, it says very clearly that one year ought to be enough for any legitimate organization to reach, that's a quote, to reach the doing business standard. Yet the agency here said that it had to be a full year of doing business. Now, it's absurd to think that makes any sense because the visa petition is approved, that petition is sent to a consular post, there is an interview, there is a security clearance, and the person can never be in the United States to start up the business for a full year. And so the agency at the AAO level has essentially ignored the rule and the prefatory comment. But that's not just in the prefatory comment. If you look at the current regulation as it exists, there are two places where it makes clear that we're not talking about a full year. In one place, it talks about what evidence is necessary to be submitted. And that is evidence that is, that the organization will support a managerial position  in another section dealing with the decision on approval or denial. It only asks that the company be doing business. So we maintain that this new office requirement is essentially ultra-virus. It's not part of the statute and it is not in accord with the purpose of the statute, particularly the liberal purpose of the Immigration Act of 1990. Now, let me turn to the definition of manager. Before I do that, I just want to note quickly that counsel for the government at trial disavowed the agency's interpretation of doing business and essentially said that they don't hold to that. But nevertheless, this Court should rule on the basis of what the agency actually decided. Turning to the term manager, this limitation was first introduced, this concept that is critical to the case, is that a manager does not include an employee who primarily performs the tasks necessary to produce the product or provide the services of the organization. And that's been essentially the determination made here, that you cannot manage a function if you perform a function. That limitation was adopted by the Church of Scientology case in 1988. But regrettably, the government has never taken into account the changes in 1990. There are three types of managers under the 1990 Act. One is a first-line supervisor of professionals. The next is a manager of at least two tiers of subordinate personnel. It has the power to hire, fire, engage in performance appraisal or leave of absence authorization. Now, in the ‑‑ it's interesting to note that when 1990 Act came about, it dropped this requirement that you cannot perform the function. And so if you set the regulations as they are today, having interpreted the 1990 Act, there's no such provision in there. Yet the agency relies on this phantom provision to suggest that it should deny this petition. If you think about it logically, the two categories that are managers deal with personnel management. But the function management expressly states, if no persons are supervised, you can be a function manager. And if that was not enough, the statute went on to add a provision that has been totally ignored in this case that says if staffing levels are used as a factor in determining whether an individual is acting in a managerial capacity, and certainly there are considerations at staffing level because they're saying there's no one else that he's component or function in light of its overall purpose and stage of development. That has not happened here. This is a new business, and there has been no consideration of the stage of development or the purpose of the organization. In fact, the government acknowledges that Mr. Dos Santos is at the top of the organizational hierarchy, and his continued role is significant. I think that if you look at the proposed rules and then the final rules interpreting the 90 Act, the 1987 regulations have been repudiated. Thank you, counsel. Your time has expired. I do have one question before we leave the podium. Yes, Your Honor. Did your client ever ask for an L-1B visa? Your Honor, the form requires a designation of L-1A or L-1B. It does not allow a checking of both. And L-1A is a far more desirable option. But he could have applied, he could have made two applications, one for an A and one for a B. Well, that's kind of absurd, Your Honor, because it would create the possibility of two different officers coming to opposite conclusions about the same set of facts, doing business, managerial status versus executive, excuse me. All right. On the specialized knowledge, the term manager exists as part of the definition. So the statute doesn't allow for any kind of mandatory election of remedies, and that's what the agency did. Thank you, counsel. Thank you. We'll hear now from the government. If it please the Court, Tom Buck, United States Attorney's Office on behalf of the Your Honor, I believe that Mr. Properoli was essentially saying that this is a case of first impression, at least post-IMAC 1990. And certainly that is not the case with respect to the managerial capacity aspect of this case. This case was decided by this Court in Family, Inc., a situation which was very similar to this case in which the Court explained and emphasized the fact that it is primarily engaged in managerial activity, that that's the position that must be filled by the beneficiary. And in this case, of course, both the or I shouldn't say both, but all three, initially the district director, then the AAO, the Administrative Appellate Office, and then the district court in reviewing the Administrative Appellate Office's decision all determined that, yes, there was evidence here that Mr. DeSantos was not engaged in primary managerial activity and thus falls outside of the definition that is required and has been required prior to IMAC and post-IMAC. What was he doing? I'm sorry, Your Honor. What was he doing? What was he doing? Well, the evidence that was before the district director of the Citizenship and Immigration Services and also the AAO indicated that he was operating slightly larger than a mom-and-pop sized organization. There were essentially three persons other than himself were being paid, and those persons during the quarter preceding his application received a total of $6,000. That's rounding off the $6,000. Was he the only one in charge of those three? Your Honor, he was certainly the person on the top of the hierarchy to the extent the hierarchy had been filled out. We have an exhibit here. It's a little manning chart or something with three or four employees. That's right. And in the Family Inc. case, there was, I recall, were five persons, either total or five persons being supervised by Mr. O, and that was deemed not to be sufficient to make the managerial. He was the mom-and-pop cleaning and pressing establishment. That's correct. He was the pop, and he also did a lot of cleaning and pressing. But if anybody was in charge, probably he was. But there was an interesting wrinkle in that case. They had a corporate structure with the headquarters in Korea, and the corporate entity was apparently located in Korea. And he was using that title as manager of this cleaning and pressing. It was really an investment immigration rather than a management. Well, the fact is that in that instance, Mr. O was an intercompany transferee with an L-1A visa, much as we have Mr. DeSantos in that identical situation here with respect to the visa. Was there a corporate entity in Brazil, and he's been dispatched up here to start this business? Your Honor, the record reflects that Mr. DeSantos has two businesses. One business preexisted, the California Corporation, and that was a business, a granite, if you will, business, located in Brazil. And then Mr. DeSantos opened a office in California, opened an office in the United States, using a California corporation, Brazil Quality Stones. So there was an affiliate, if you will, in Brazil. But the key is not whether there was a hierarchy. There's no question that he was. If he was in charge of the operation here, why wouldn't he be the manager? Well, for the same reason that in the Family Inc. case he wasn't the manager, Your Honor, because Mr. O was not a manager under the definition of the regulations, because you must be engaged primarily in managerial activity as opposed to operations themselves. And it's a distinction that is followed by the Citizenship and Immigration Services pursuant to regulation. Maybe in some instances more difficult to draw than others, but in this instance, as in Family Inc., the size of the operation simply did not lend itself to having a manager engaged primarily in managerial activity. There wasn't enough going on to need a manager. Precisely, Your Honor. Precisely. And it must be emphasized that there are two elements of the determination here, both of which must be shown to be incorrectly determined by the AAO. There's the managerial capacity element, and there's also independently the doing business element. And the district court found that in both respects the AAO had not erred. They had not acted in an arbitrary capricious. It's reasonable to get him back to the doing business question. Yes, Your Honor. Which is an interesting question. How long does the entity have to be doing business before it qualifies as doing business? Your Honor, Mr. DeSantis was given an L-1A visa to open the new office. At the time of opening the new office, he has to have shown, in order to get that one-year visa, he had to have shown that he had facilities, that he had a financial capacity to begin operations immediately. Then, at the end of that year, you can apply for a renewal, a three-year renewal. There's a certain amount of bureaucratic lag in getting from point A to point B. How do you count that lag? Is that charged against the one-year, or does the year start after he gets here and opens the shop? I believe the record would show that an individual need not enter the United States for the first time as an L-1A entrant. That you can obtain a B-1 visa as a business visitor, as I believe Mr. DeSantis did in this instance. The record does not reflect that. The record only reflects what he applied for. But in order to have obtained a facility prior to applying for the L-1A visa in the first instance, somebody needed to be here, be it an agent or Mr. DeSantis himself, to locate that facility. Perhaps to speak with a lawyer about getting the L-1A. But in any event, once you have the L-1A, you need to begin your operations as promised. Let me understand the answer to Judge Goodwin's question. I'm sorry, Your Honor. The one-year period starts to run from what? What triggers it? The regulation states, Your Honor, that at the time you seek the renewal, you are required to have been doing business for the previous year. Now, what counsel suggested that was conceded by counsel at trial court was simply that I did not ascribe to counsel's argument that that statute means that you must be doing business each of the 12 months. No. Maybe this was not Judge Goodwin's question. I think it was. But it's certainly mine now. Okay. You say after a year, you have to apply for the extension. Right. At the end of that year. Okay. What I'm asking about is what triggers the beginning of that first year. Yes. The issuance of the L-1, which is for a one-year period, begins the one-year period referred to. Not the application for it? I'm sorry. Not the application for it. No, because I believe, Your Honor, that it's the issuance. And there's a notice that was in the record in this case showing that the visa was issued effective August 29th of 2002 and ran until, and it's all on that notice, ran until August 29th of year 2003. That is the one-year period that we're speaking of. Now, counsel has argued that the absurd observation of the AAO would require that each of those months they be doing business. Well, the doing business requirement is the regular, systematic, and continuous providing of goods and services. But the regulation doesn't say how many months. It simply says for the previous year. The district court, I think, properly said, in this instance, where there are only two months of invoices showing sales, May and June of 2003, showing sales of product, and where the first documentation shows that inventory was acquired in December of 2002, but that's not good enough. We don't need to draw the line precisely of how many months of that previous year are necessary in order to fulfill the four-previous-year requirement. But in this instance, they were not fulfilled. And I would emphasize also that even if the court could conclude that the AAO erred with respect to doing business standard and erred under the arbitrary, capricious, and not otherwise in compliance with law standard, the district court properly recognized that it's a two-pronged test, and that in this instance, Brazil Quality Stones failed to meet either prong. And I might add also with respect to the AAO. But we're not dealing with the district court here. I'm sorry, Your Honor. Are we? Isn't this an appeal from the AAO? It is an appeal from the AAO, but it was an APA review case, Your Honor, which was heard by the district court. Okay. Judge Walton, all right. The district court sat as this court in the practice of reviewing the administrative questions. All right. This is the second level of review. That's the second level of review. And the district court properly recognized that both prongs were in fact satisfied by the AAO, and that it's the burden of Brazil Quality Stones to show that both were in fact in error. Well, then what is the standard review that we apply to Judge Walter's determination, as opposed to the standard that he applies to the AAO determination? Your Honor, I believe that as in Family Inc., the court applies the same standard the district court applied to the AAO decision. And the court has the benefit of seeing the district court's review, but this is, again, a review of the AAO decision. Okay. I might add also in this instance, and the district court did point this out in his decision, the Brazil Quality Stones did not argue before the AAO that the director of the California Service Center committed any error in applying the doing business standard in its original decision. So, in other words, the district director of California Service Center issued a decision saying Brazil Quality Stones, you don't satisfy the requirements of the petition or the standard for the petition in two respects. One, you don't meet the doing business standard. And two, the position that Mr. DeSantis was fulfilling doesn't meet the managerial capacity decision. Then, not in the current counsel, but counsel for DeSantis and Brazil Quality Stones appealed to the AAO, and they only argued that the managerial capacity standard was not met. Thank you, counsel. Your time has expired. Mr. Paparelli, there was a malfunction on the clock, which gave the government at least a minute over its allotted ten minutes. So you have the opportunity to have rebuttal of about a minute. Your Honor, there are some additional issues in the case. The AAO gave no evidentiary weight to a professor's opinion from Pace University that talks about what is reasonable in the course of a start-up business on the alleged ground that the professor had no familiarity with the standard. And the AAO did not have any familiarity with Brazil Quality Stones. But the professor took a description of what Mr. DeSantis was doing and concluded that he was certainly within the norm of what is reasonable. And remember, the 1990 Act says the reasonable needs of the organization and its stage of development need to be considered. This has never been considered here. I think that also there was error, as we began to discuss, in not allowing an L1B to be considered. The agency has no authority to mandate a selection or an election of remedies. Further, the agency ought to have considered the equitable principle of tolling or automatic tolling and allowed for the filing of an L1B application. The agency is flat wrong on the question of doing business for a full year. Just as Your Honor suggested, there is a lag time. And it's not just reserving a facility, but it's importing stone. The man didn't arrive until a month and a half after the visa was granted. He then promptly began to import stone. His business plan, as the record will reflect, indicated, and as the Court found below, that his business plan contemplated both engaging in services and engaging in the sale of product. And the definition of doing business considers engaging in services as doing business. And so he was doing business very early on. He's importing stone, and it's not precious stones that are small. It's countertops and so on. What's the mechanism by which the stones are imported? My guess is they're not coming in by airplane. Are they coming in by ship? How are they coming in? I mean, this goes to the question of how fast this can happen. I don't know the answer to that question, but I'm assuming they're coming by a ship because they're obviously very heavy stones. And there is some sophistication and expertise in the selection. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Goodwin, O'scannlain, Fletcher